**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

———————————

No. 23-3353

———————————

**UNITED STATES OF AMERICA,**

Appellee,

v.

**LESTER E. BROWN,**

Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GREG KAYS, DISTRICT JUDGE

———————————

**BRIEF FOR THE UNITED STATES**

———————————

TERESA A. MOORE
  United States Attorney

BRIAN P. CASEY
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Appellee*

# SUMMARY OF THE CASE

A jury convicted Lester Brown of cyberstalking resulting in death, among other crimes, and the district court sentenced him to life in prison.

On appeal, Brown first contends that the district court erred in admitting five purported hearsay statements. The district court properly admitted two of the statements as reports of the declarant's then state of mind. A third was a command, and therefore not hearsay. The fourth statement was Brown's and was properly admitted under the party-opponent rule, and the fifth for the non-hearsay purpose of recounting that a conversation occurred.

Brown next contends that the district court erred in admitting evidence regarding Brown's history with his victim, including their prior drug dealing together and Brown's request for payment for the return of the victim's friend, who the victim later learned had been murdered. The district court properly admitted that evidence to prove the victim's reasonable fear of death.

Brown lastly contends that there was not sufficient evidence to convict him, but the evidence was overwhelming that Brown, along with two others, threatened his victim in person and through the internet and used GPS devices to track his victim, including on the night of his murder. There was more than sufficient evidence to convict.

The Government believes that 10 minutes of oral argument is sufficient.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ...........................................................................i

TABLE OF CONTENTS.............................................................................ii

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT OF THE ISSUE ....................................................................1

STATEMENT OF THE CASE .....................................................................3

    A. The murder of Christopher Harris ...................................................4

    B. Initial investigation ..........................................................................5

    C. Brown's threats to Harris ….............................................................6

    D. Testimony of codefendants and jailhouse informants ...................10

    E. Electronic Evidence.........................................................................13

SUMMARY OF THE ARGUMENTS ........................................................17

ARGUMENT I

The district court properly admitted the statements Brown now challenges as hearsay as statements of the declarant's then state of mind, statements of a party-opponent, and for non-hearsay purposes…………...........................20

    A. Standard of Review ........................................................................20

    B. Discussion ......................................................................................21

ARGUMENT II

The district court did not err in admitting testimony regarding Brown's previous drug dealing and murder of Ryan Cobbins because both topics were direct evidence of the victim's reasonable fear of bodily injury from Brown. ..................................................................................................................35

     A. Standard of Review .......................................................................36

     B. Discussion ....................................................................................36

ARGUMENT III

There is sufficient evidence to affirm both Brown's conspiracy conviction and his conviction for cyberstalking resulting in death..........................................44

     A. Standard of Review .......................................................................44

     B. Discussion ....................................................................................45

CONCLUSION .........................................................................................57

CERTIFICATE OF COMPLIANCE ............................................................58

CERTIFICATE OF SERVICE ....................................................................59

# TABLE OF AUTHORITIES

## Cases

*Blumenthal v. United States*, 332 U.S. 539 (1947)........................................ 56

*Johnson v. United States*, 520 U.S. 461 (1997)........................................... 21

*Jones v. United States*, 527 U.S. 373 (1999) ............................................... 21

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999) ......................... 25

*Stokeling v. United States*, 586 U.S. 73 (2019) ........................................... 46

*United States v. Anderson*, 783 F.3d 727 (8th Cir. 2015) ........................... 54

*United States v. Barraza*, 576 F.3d 798 (8th Cir. 2009)......................... 1, 23

*United States v. Boykins*, No. 23-1625, 2024 WL 208346 (8th Cir. Jan. 19, 2024)................................................................................................. 30

*United States v. Brown*, 88 F.4th 750 (8th Cir. 2023) .................................. 42

*United States v. Cacioppo*, 460 F.3d 1012 (8th Cir. 2006) ......................... 44

*United States v. Campbell*, 764 F.3d 880 (8th Cir. 2014) ........................... 37

*United States v. Cannon*, 475 F.3d 1013 (8th Cir. 2007) ............................ 20

*United States v. Clay*, 618 F.3d 946 (8th Cir. 2010) ................................... 56

*United States v. Crow Ghost*, 79 F.4th 927 (8th Cir. 2023) ........................ 42

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) ................................... 37

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021).............................. 28

*United States v. De La Cruz Nava*, 80 F.4th 883 (8th Cir. 2023) ............... 33

*United States v. DeAngelo*, 13 F.3d 1228 (8th Cir. 1994)........................... 36

*United States v. DeMarce*, 564 F.3d 989 (8th Cir. 2009)...................... 28, 29

*United States v. Earth*, 984 F.3d 1289 (8th Cir. 2021)................................. 20

*United States v. Edwards*, 782 F.3d 554 (10th Cir. 2015)........................... 52

*United States v. Fleury*, 40 F.4th 1353 (11th Cir. 2021) ............................ 46

*United States v. Gant*, 721 F.3d 505 (8th Cir. 2013).................................... 41

*United States v. Gilliam*, 934 F.3d 854 (8th Cir. 2019)................................ 33

*United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018) .............. 2, 37, 50, 55

*United States v. Grady*, 88 F.4th 1246 (8th Cir. 2023) ................................ 36

*United States v. Guzman*, 926 F.3d 991 (8th Cir. 2000) .................... 1, 38, 41

*United States v. Hobgood*, 868 F.3d 744 (8th Cir. 2017)......................... 2, 46

*United States v. Ihmoud*, 454 F.3d 887 (8th Cir. 2006)............................... 44

*United States v. Jongewaard*, 567 F.3d 336 (8th Cir. 2009) ....................... 43

*United States v. LeCompie*, 108 F.3d 948 (8th Cir. 1997) ........................... 39

*United States v. Lee*, 790 F.3d 12 (1st Cir. 2015) .................................... 1, 38

*United States v. Lussier*, 844 F.3d 1019 (8th Cir. 2017) .............................. 44

*United States v. Marrowbone*, 211 F.3d 452 (8th Cir. 2000)....................... 33

*United States v. Maxwell*, 643 F.3d 1096 (8th Cir. 2011) ............................ 37

*United States v. Monds*, 945 F.3d 1049 (8th Cir. 2019)............................... 42

*United States v. Naiden*, 424 F.3d 718 (8th Cir. 2005) ............................... 24

*United States v. Needham*, 852 F.3d 830 (8th Cir. 2017)............................. 33

*United States v. Partyka*, 561 F.2d 118 (8th Cir.1977) ............................... 24

*United States v. Pirani*, 406 F.3d 543 (8th Cir. 2005)................................. 21

*United States v. Ralston*, 973 F.3d 896 (8th Cir. 2020)............................... 26

*United States v. Ramirez-Martinez*, 6 F.4th 859 (8th Cir. 2021) ........... 30, 31

*United States v. Roberts*, 84 F.4th 659 (6th Cir. 2023) ................................ 48

*United States v. Rodriguez-Lopez*, 565 F.3d 312 (6th Cir. 2009) ............... 27

*United States v. Skarda*, 845 F.3d 370 (8th Cir. 2016) ................................ 41

*United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022) ................. 2, 37, 46

*United States v. Stoney End of Horn*, 829 F.3d 681 (8th Cir. 2016) ........... 33

*United States v. Tenerelli*, 614 F.3d 764 (8th Cir. 2010) ............................ 28

*United States v. Thirion*, 813 F.2d 146 (8th Cir. 1987) ............................... 52

*United States v. Thomas*, 451 F.3d 543 (8th Cir. 2006) ........................... 1, 27

*United States v. Thompson*, 285 F.3d 731 (8th Cir. 2002) .......................... 45

*United States v. Torres*, No. 21-2662, 2023 WL 378942 (2d Cir. Jan. 24, 2023) ............................................................................................................ 39

*United States v. Turner*, 781 F.3d 374 (8th Cir. 2015) ............................... 26

*United States v. Turner*, 934 F.3d 794 (8th Cir. 2019) ............................ 1, 29

*United States v. Wainright*, 351 F.3d 816 (8th Cir. 2003) .......................... 45

*United States v. Walker*, 428 F.3d 1165 (8th Cir. 2005) ......................... 1, 43

*United States v. Walker*, 665 F.3d 212, (1st Cir. 2011) ..................... 1, 39, 41

*United States v. Wantuch*, 525 F.3d 505 (7th Cir. 2008) ............................ 26

*United States v. Waters*, 70 F.4th 467 (8th Cir. 2023) ................................ 21

*United States v. White Plume*, 847 F.3d 624 (8th Cir. 2017) ...................... 40

*United States v. Wright*, 540 F.3d 833 (8th Cir. 2008) ............................... 32

*United States v. Young*, 753 F.3d 757 (8th Cir. 2014) ................................ 37

## Statutes

18 U.S.C. § 2 ........................................................................................... 51, 52

18 U.S.C. § 371................................................................ 3, 44, 54

18 U.S.C. § 2261A ............................ 3, 35, 37, 42, 44, 46, 47

18 U.S.C. § 2266.................................................................... 48

18 U.S.C. § 922(g)(1) ............................................................. 3

## **Rules**

Fed. R. Evid. 103 ................................................................... 30

Fed. R. Evid. 403 ................................................................... 41

Fed. R. Evid. 404 ....................................................... 35, 36, 42, 43

Fed. R. Evid. 701 ................................................................... 26

Fed. R. Evid. 801 ............................................................... 20, 29

Fed. R. Evid. 803 ........................................................... 23, 24, 25

Fed. R. Evid. 901 ................................................................... 31

# STATEMENT OF THE ISSUES

## I.

Whether the district court properly admitted the statements Brown now challenges as hearsay as statements of the declarant's then state of mind, statements of a party-opponent, and for non-hearsay purposes.

### Cases

*United States v. Barraza*, 576 F.3d 798 (8th Cir. 2009)

*United States v. Thomas*, 451 F.3d 543 (8th Cir. 2006)

*United States v. Turner*, 934 F.3d 794 (8th Cir. 2019)

## II.

Whether the district court erred in admitting testimony regarding Brown's previous drug dealing and murder of Ryan Cobbins where both topics were direct evidence of the victim's reasonable fear of bodily injury from Brown.

### Cases

*United States v. Guzman*, 926 F.3d 991 (8th Cir. 2000)

*United States v. Lee*, 790 F.3d 12 (1st Cir. 2015)

*United States v. Walker*, 665 F.3d 212, (1st Cir. 2011)

*United States v. Walker*, 428 F.3d 1165 (8th Cir. 2005)

**III.**

Whether there is sufficient evidence to affirm both Brown's conspiracy conviction and his conviction for cyberstalking resulting in death.

## <u>Cases</u>

*United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022)

*United States v. Hobgood*, 868 F.3d 744 (8th Cir. 2017)

*United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018)

## STATEMENT OF THE CASE

On March 14, 2018, Lester Brown, Michael Young, and Ronnell Pearson followed Christopher Harris using a GPS tracker that had been surreptitiously placed on Harris's car. When Harris stopped at his former girlfriend's house to drop off their daughter after a dance class, Brown pulled up behind Harris's car and blocked him in. Brown then exited his car and shot Harris twice in the head, killing him while his daughter ran inside.

Harris feared this day would come because Brown had threatened, including through on-line communications, that Harris would end up like his friend Ryan Cobbins, who had been murdered years before. Harris and Cobbins had been involved in marijuana transactions with Brown before Cobbins's murder. Brown was now demanding money from Harris lest he meet Cobbins's fate, and Harris feared for his life as a result.

For that conduct, a jury found Brown guilty of conspiracy to commit cyberstalking, in violation of 18 U.S.C. § 371; cyberstalking resulting in death, in violation of 18 U.S.C. §§ 2261A, 2261(b), and 2; and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The district court later sentenced Brown to life for the cyberstalking resulting in death count, along with consecutive, statutory-maximum sentences for the other two counts. Brown now appeals,

challenging the district court's admission of certain evidence and the sufficiency of the Government's case against him.

## A. *The murder of Christopher Harris*

On March 14, 2018, Christopher Harris drove his then eight-year-old daughter home from her dance class. (Tr., Vol I, at 53-54.) His daughter lived with her mother on a quiet street with little traffic. (Tr., Vol. I, at 62-63, 78, 89.) Harris was driving the daughter that week because the mother had recently had surgery. (Tr., Vol. I, at 53-54; 64; Tr., Vol. II, at 178.) When they arrived, Harris pulled into the driveway. (Tr., Vol. I, at 56, 66.) Shortly after, a neighbor heard loud music and saw another car block Harris's in the driveway. (Tr., Vol. I, at 79.) Two men had exited the second car, one of whom pointed a firearm. (Tr., Vol. I, at 80.) Someone asked Harris, "What's that shit you was talking, cuz?" (Tr., Vol. I, at 66, 79.) Harris was scared and loudly pleaded, "I've got my daughter with me, I've got my daughter with me." (Tr., Vol. I, at 56-57; 66, 68.) The voice responded, "I ain't trying to get her. I don't give a fuck." (Tr., Vol. I, at 80.)

Gun shots rang out. (Tr., Vol. I, at 56; 66, 80.) Harris pushed his daughter from the passenger seat and followed her out the passenger side of the car. (Tr., Vol. I, at 57.) They fell trying to get to the duplex as more gunshots were fired. (Tr., Vol. I, at 57, 68.) His daughter made it into the

house, screaming "They're shooting at my daddy. Mommy. Mommy, somebody's shooting at my daddy." (Tr., Vol. I, at 58; 66-67, 69.) Harris died in front of the home of two gunshot wounds to his head. (Tr., Vol. I, at 69; Tr., Vol. II, at 117; 137, 156, 158.) The first entered the back of his head, passed through his skull, and exited the other side, causing a devasting injury that dropped Harris to the ground. (Tr., Vol. II, at 162-63.) The other entered his cheek and exited at his ear while he was lying on the ground. (Tr., Vol. II, at 159-60, 166.) The medical examiner declared the manner of death was homicide. (Tr., Vol. II, at 167.)

**B.** *Initial investigation*

Officers found markings in the concrete where bullets had been fired while Harris was lying there. (Tr., Vol. II, at 117-18.) Officers found six .45 shell casings at the scene, some by Harris's car and the others by Harris's body. (Tr., Vol. II, at 119-20, 122, 126-31, 137, 250.) Officers found $5,000 in Harris's clothes, which led them to rule out robbery as a motive for the shooting. (Tr., Vol. II, at 136-37.)

Forensic testing on the recovered shell casings determined they were all fired by the same gun. (Tr., Vol. II, at 247, 250.) Officers in Kansas investigating a different case later recovered a shell casing with markings that matched the shell casings from Harris's murder. (Tr., Vol. II, at 349-51.)

Forensic examination determined that all seven of the casings—the six recovered from Harris's murder scene and the seventh recovered in Kansas— had been fired from the same Glock, Model 21, .45 caliber pistol with Serial No. LGG671. (Tr., Vol. II, at 348, 355, 360.)

Officers also found four bullet holes in the driver's side of Harris's car. (Tr., Vol. II, at 122, 194.) Officers took Harris's car from the scene for further analysis and located three bullets and one bullet fragment in it. (Tr., Vol. II, at 123, 193.) There were two bullet holes in the back of the driver's seat and two in the inside of the front passenger's side door in a location that shows that door was open when the car was hit. (Tr., Vol. II, at 194-95, 195-96.) Officers later located a black box containing a GPS tracker attached to the frame of the car by a strong magnet. (Tr., Vol. II, at 205-06.) The GPS device was active and had a visible fingerprint on it. (Tr., Vol. II, at 206-07; 226.) A forensic examiner identified the print as belonging to Lester Brown. (Tr., Vol. II, at 229.)

## C.    _Brown's threats to Harris_

Antwon Tolefree pled guilty to selling marijuana in the Western District of Missouri and provided information both in his case and in this case as part of his cooperation with the Government. (Tr., Vol. III, at 403.) Tolefree testified in this case because he had known Harris since they were

teenagers and wanted justice for his friend. (Tr., Vol. III, at 404.) He and Harris were best friends, sold marijuana together, and saw each other every day. (Tr., Vol. III, at 405.) Tolefree had also known Ryan Cobbins since they were teenagers, and the three of them sold marijuana together back in 2013. (Tr., Vol. III, at 406.) Tolefree met Brown at that time through his marijuana dealings with Harris and Cobbins. (Tr., Vol. III, at 406-07.) Tolefree recalled Harris and Cobbins traveling to Arizona with Brown in 2013, and when Harris and Cobbins returned they told Tolefree not to deal with Brown again. (Tr., Vol. III, at 407, 409-10.)

Later in 2013, Cobbins disappeared. (Tr., Vol. III, at 410.) Cobbins went to barber shop, but Tolefree could not reach him afterward and never saw him again. (Tr., Vol. III, at 410.) Tolefree watched Harris pay Brown $20,000 to $30,000 in cash for Cobbins's safe return because Brown claimed that his cousins had Cobbins. (Tr., Vol. III, at 411.) Brown said Harris and Tolefree would hear from Cobbins within a couple of hours after the payment and left with the money. (Tr., Vol. III, at 411.) Tolefree later learned that Cobbins had been found dead. (Tr., Vol. III, at 412.) After learning about Cobbins's death, Harris stopped the marijuana business for a time and moved to California because he was scared. (Tr., Vol. III, at 413.) No one was ever charged for Cobbins's murder. (Tr., Vol. III, at 436.)

Harris returned to the Kansas City area sometime thereafter and resumed selling marijuana with Tolefree. (Tr., Vol. III, at 405, 413.) During late 2017 and into 2018, Tolefree was living in Kansas City, Missouri, and driving a special kind of Dodge Charger called a Hellcat. (Tr., Vol. III, at 413-14.)

Tolefree did not have contact with Brown again until he and Harris ran into Brown at a shopping mall in February 2018. (Tr., Vol. III, at 414-15, 418, 423, 425.) Brown approached Harris at the mall, they talked, and then Harris left. (Tr., Vol. III, at 418.) Brown later reapproached Harris and told Harris to call him because Harris had given him a wrong number. (Tr., Vol. III, at 418.) Brown recorded this incident and posted the video on social media. (Tr., Vol. III, at 420.) Tolefree saw the video and described Harris as trying to get out of the video without causing a commotion. (Tr., Vol. III, at 415-21.) After that encounter, Harris's behavior changed. (Tr., Vol. III, at 421.) Harris stopped driving his cars, stopped going into stores, and hired Tolefree's grandfather to drive him. (Tr., Vol. III, at 422.) Sometimes he would stay at Tolefree's place. (Tr., Vol. III, at 422.)

The mother of Harris's daughter also saw the video of Brown and Harris on social media in February 2018. (Tr., Vol. I, at 61.) She knew that Harris sold marijuana, but the video surprised her because she knew Brown

and knew that Harris and Brown did not have a relationship and were not friends. (Tr., Vol. I, at 60-62.) She also noticed Harris's behavior change, such as saying he was going to move out of town or move to a home with more security to protect himself and their daughter. (Tr., Vol. I, at 62.)

Victor McVea, who was in federal custody for dealing marijuana, also testified that Harris's behavior changed during the same time period. (Tr., Vol. III, at 387, 389-90.) Harris told McVea that he was worried that someone was trying to kill him, and McVea saw Harris move to an apartment in the Briarcliff where he needed to scan a card to enter or use the elevator. (Tr., Vol. III, at 387, 389-90.)

After the mall incident, Brown began to send threatening messages to Tolefree and Harris via Snapchat, which deletes messages after the recipient reads them. (Tr., Vol. III, at 414, 445.) Brown demanded $10,000 a month from Tolefree and Harris and said they that if they did not pay him, then Harris would end up like Cobbins. (Tr., Vol. III, at 415-16.) Harris showed Tolefree a screenshot of a similar message that he received. (Tr., Vol. III, at 443-44.) Brown also sent Tolefree a photo of a tracking device, and Tolefree and Harris began taking their vehicles to auto shops to search for trackers. (Tr., Vol. III, at 417-18, 423.) On March 1, 2018, Harris texted his girlfriend a photo of her

car on a lift being searched, but they did not find a tracker. (Tr., Vol. II, at 176-78; Tr., Vol. III, at 417-18.)

After Harris's funeral, Tolefree found a tracker on his own car and threw it off a bridge. (Tr., Vol. III, at 424.)

**D.** _**Testimony of codefendants and jailhouse informants**_

Brown's two codefendants in this case—Ronnell Pearson and Michael Young—described how Brown murdered Harris on March 14, 2018.

Pearson pled guilty to the conspiracy count and faced up to five years' imprisonment. (Tr., Vol II, at 259, 277.) Brown and Young are his cousins, and on March 14, 2018, they left another cousin's house in Brown's car, with Brown driving, Young in the passenger seat, and Pearson in the back. (Tr., Vol. II, at 266-68.) The three left to "bust a move," and drove past the dance studio where Harris's car was parked. (Tr., Vol. II, at 268-69.) Brown said that this "was a lick," meaning to Pearson that Brown intended to rob Harris. (_Id._, at 270, 294.) They later parked at an apartment building where Brown and Young were on their phones tracking Harris. (Tr., Vol. II, at 271.) When Harris came close to their location, Brown got excited and pulled out of the apartment lot. (Tr., Vol. II, at 271.) Pearson saw two people in Harris's car, which Brown followed down a street and blocked in a driveway. (Tr., Vol. II, at 271-73.) Brown said that "it is over with," and jumped out of the car,

with Young following.  (Tr., Vol. II, at 273.)  Pearson heard gunshots but did not watch the shooting.  (Tr., Vol. II, at 273.)  Brown and Young re-entered the car and sped off.  (Tr., Vol. II, at 274.)  Brown later tried to give Pearson a backpack that Person believed had the gun in it, but Pearson refused to take it.  (Tr., Vol. II, at 298.)

Young pled guilty to the cyberstalking resulting in death count and faced up to life imprisonment.  (Tr., Vol., III, at 493, 524.)  Young also stated that Brown and Pearson are cousins.  (Tr., Vol. III, at 497.)  Young admitted using two phones in January 2018, and recalled Brown typing a license plate into the Notes app on his iPhone, which Young saved.  (Tr., Vol., III, at 497-98.)  Young also recalled searching his phone for Tolefree's home address so that he could drive by it looking for a Hellcat.  (Tr., Vol. III, at 499.)  Young likewise drove with Brown to the apartments at Briarcliff but did not see who they were looking for.  (Tr., Vol. III, at 500-01.)  Young's use of phone to save a license plate and search for Tolefree's residence were confirmed by a forensic examination of his phone after his arrest.  (Tr., Vol. III, at 540-44.)

Young recounted that on March 14, 2018, he left his cousin's house with Brown and Pearson in a Black Avenger that Brown was driving.  (Tr., Vol. III, at 503.)  They went to the dance studio, where Brown pointed out Harris's car, indicating to Young that Brown was "back for business."  (Tr.,

Vol. III, at 504-05.)  Brown stated that he had "to get him now."  (Tr., Vol. III, at 506.)  At some point, Brown was on Young's phone tracking Harris's car thought the SpyTec GPS.  (Tr., Vol. III, at 509-10, 525.)  They drove to where Harris's car was and blocked it in the driveway.  (Tr., Vol. III, at 506.)  Brown and Young both got out of the car, and Young watched Brown fire several shots at Harris, killing him.  (Tr., Vol. III, at 506-07.)  When Brown dropped Pearson off, Pearson refused to take the gun.  (Tr., Vol. III, at 509.)

Three jailhouse informants—Andre Miller, Victor McVea, and Kenneth Jones—corroborated Pearson and Young's accounts by testifying that Brown admitted while in custody to killing Harris.  Both Miller and McVea met Brown while he was in pretrial custody in 2018, while Jackson met Brown in 2020.  (Tr., Vol. III, at 311, 319, 467.)  Brown admitted that he killed Harris in front of his daughter and that he should have killed her too.  (Tr., Vol. III, at 313-14, 391-92, 471-72.)  Brown told Miller that he put a tracker on Harris's car and was plotting to rob or kidnap Harris to get money.  (Tr., Vol. III, at 313-15.)  Brown also told Miller that he brought zip ties with him to tie Harris up, and officers recovered three sets of zip ties fashioned like handcuffs from the car Brown was driving when they arrested him.  (Tr., Vol. III, at 314, 363-64.)  Brown told Jones that he was upset that Harris would not let Brown do business with him, so he decided to extort or rob Harris instead.

(Tr., Vol. III, at 470-71.)  Brown also told Jones that he put a tracker on Harris'
car, calling it his biggest mistake in the whole case because he registered the
tracker in his own name.  (Tr., Vol. III, at 471.)

### E.    *Electronic evidence*

In 2018, Brown was living at his then girlfriend's house.  (Tr., Vol. II,
at 255-56, 302-03.)  On February 20, 2018, Brown used his girlfriend's eBay
account to purchase two GPS tracking devices and a magnetic case from a
company called SpyTec.  (Tr., Vol. II, at 305-06.)  Those items were delivered
to Brown's residence, and the girlfriend gave the package to Brown.  (Tr.,
Vol. II, at 306-07.)   The SpyTec devices provide real time location
information that users can access through the internet.  (Tr., Vol, III, at 578-
80.)  At the time, Brown used the email address kcnerds@yahoo.com to
register the SpyTec device under an account named lesterbrown78, which he
created on March 11, 2018.  (Tr., Vol. II, at 304-05; Tr., Vol. III, at 584.)

Records provided by SpyTec and its affiliated company Sieva
Networks showed that the device later found on Harris's car was activated on
March 11, 2018, at Brown's residence.  (Tr., Vol. III, at 586-88; Tr. Vol. IV,
at 604-05, 610-11, 626-30.)  On March 12, that device moved north from
Brown's residence and ended up near Harris's apartment in the Briarcliff area.
(Tr., Vol. IV, at 631.)  The next day, the device traveled to Harris's mother's

house and spent the night back at Harris's apartment. (Tr., Vol. IV, at 633-34.) On March 14, the date of Harris' s murder, the device traveled to Harris's daughter's home, to the dance studio in time for her dance class, to Tolefree's house for a short time, back to the dance studio for about 45 minutes, and then back to the daughter's residence at the same time Harris was murdered. (Tr., Vol., IV, at 634-38.) Login records showed significant activity on Brown's SpyTec account from roughly 5:00 p.m. to 8:30 p.m. the night of Harris's murder. (Tr., Vol. IV, at 650.)

A review of the IP address logs from SpyTec and Sieva showed that the lesterbrown78 account was most frequently logged into at Brown's residence, another residence he frequented, or through T-Mobile, which was Brown's cellular service provider. (Tr., Vol. IV, at 604-07, 638, 647-49.) Although Brown's phone was locked and law enforcement had not been able to access it by the time of trial, IP address logs from Brown's email and Apple accounts showed the same IP address patterns, including the phone frequently accessing the internet through at the same two locations and through T-Mobile. (Tr., Vol. III, at 530-531; Tr., Vol. IV, at 654-56, 752, 772-73.) Brown's Apple account also contained an account activation email from SpyTec on March 11, 2018, at 2:05 p.m. as well as two screen shots from the website spytecgps.com (Tr., Vol. IV, at 765, 768.)

When Brown was arrested, officers found a Mazuma Credit Union debit card on him. (Tr., Vol IV, at 657.) The same debit card was used to pay for Brown's SpyTec account. (Tr., Vol. III, at 586; Tr., Vol IV, at 657-58.) A review of the records for the debit card account revealed payments to Globalstar, a company that sells GPS trackers called SPOT. (Tr., Vol. IV, at 660-63, 677.) Lester Brown was the name on the SPOT account, which was registered with Brown's kcnerds@yahoo.com email address. (Tr. Vol. III, at 678-79.) Brown's Apple account records show he downloaded the SPOT application in January 2018, and it was on his phone through at least that February. (Tr., Vol. IV, at 756-57, 762-63.)

Brown bought two SPOT devices, and location data from the second device revealed that the SPOT tracker was at the hair salon where Harris's girlfriend worked on January 18, 2018. (Tr., Vol. IV, at 679-80, 695.) The SPOT tracker's presence at the hair salon on January 18, 2018, corresponded with a note from the same date found on Young's phone recording the license plate number of Harris's girlfriend's white Cadillac. (Tr., Vol. II, at 174; Tr., Vol. III, at 540; Tr., Vol. IV, at 695-96.) After that date, the device was often at Tolefree's residence and Harris's residence. (Tr., Vol. IV, at 698-700.) The device was also at the locations where Harris was pulled over by police on February 12 and again on February 22. (Tr., Vol. III, at 679-80; Tr. Vol. IV,

at 698, 700-701.)  The tracker was in the police tow lot while Harris's car was impounded and went to the house of Harris's family member that picked the car up.  (Tr., Vol. IV, at 701-704.)  A screenshot in Brown's Apple account contains a picture of that residence.  (Tr., Vol. IV, at 762.)

Screenshots found in Brown's Apple account from after Harris's murder show an image from a video showing Tolefree and Tolefree's Instagram account.  (Tr. Vol. IV, at 676-677.)

## SUMMARY OF THE ARGUMENTS

The evidence at trial showed that beginning in January 2018, Lester Brown placed GPS devices on Christopher Harris's car to track where Harris went. Brown then threatened Harris that if Harris did not begin paying Brown $10,000 a month, Harris would end up like his friend Ryan Cobbins, who had been murdered years before. Harris was afraid, and he changed his behavior out of that fear. Harris searched under the cars of family members for GPS devices, but never found one. Brown used the device that Harris did not find, the device on Harris's car, to stalk him, find him in front of his daughter's home, and murder him while he desperately tried to run his daughter to safety. For that conduct, the jury convicted Harris of conspiracy to commit cyberstalking, cyberstalking resulting in death, and being a felon in possession of a firearm. And for the reasons explained below, this Court should affirm those convictions.

In this appeal, Brown first claims that the district court erred in admitting five alleged hearsay statements. Brown, however, relies on standing objections that do not apply to some of his claims on appeal. Whether preserved or not, the court did not err, because some of the statements were properly admitted as statements of the declarant's then state of mind, others were admitted as admissions of a party opponent, and still

others were admitted for non-hearsay purposes. But even if the court erred in admitting some of the now challenged statements, any error was harmless given the overwhelming evidence of Brown's guilt.

Brown next claims that the district court erred in admitting evidence about his and Harris's prior dealings. In particular, Brown claims the district court erred in admitting evidence that Brown, Harris, and Ryan Cobbins dealt marijuana together, but after Harris and Cobbins refused to do business with Brown any longer, Cobbins went missing and was later found murdered. That history, however, provides direct evidence of Harris' reasonable fear of bodily injury when Brown later demands that Harris must pay Brown or Harris will end up like Cobbins. The history between Brown and Harris is not other act evidence, rather it is intrinsic to the crimes charged and the district court correctly admitted it for that purpose.

Lastly, Brown claims there was insufficient evidence to convict of the conspiracy and cyberstalking resulting in death counts. The evidence, however, was overwhelming and Brown's arguments for its insufficiency fail. Brown claims that the evidence did not prove that Brown aided or abetted anyone in cyberstalking Brown, but such proof was not required to convict Brown of that count. Brown next claims that the evidence did not prove that his cyberstalking conduct resulted in Harris's death, but the evidence showed

that Brown found Harris on the night of the murder by using the GPS tracker Brown placed on Harris's car. Brown finally claims that there was not sufficient evidence to prove that Brown conspired to commit cyberstalking, but Brown's co-conspirators need only have come to an agreement with Brown to commit the crime, they need not have known every detail of Brown's plan. The evidence proved such an agreement, and this Court should affirm both convictions.

# **ARGUMENTS**

## **I.**

**The district court properly admitted the statements Brown now challenges as hearsay as statements of the declarant's then state of mind, statements of a party-opponent, and for non-hearsay purposes.**

Brown appeals five different statements made by two witnesses—two by Victor McVea and three by Antwon Tolefree—on hearsay grounds. *See* Fed. R. Evid. 801 and 802; (Brown Brf. at 19). Brown claims that the district court admitted each statement "[o]ver objection" and "as evidence of Harris' state of mind, and therefore an exception to the hearsay rule." (Brown Brf., at 19.) As the record shows, however, whether Brown objected to each statement and the proper ground for the statement's admission varies. Nevertheless, the district court properly admitted each statement, and this Court should affirm.

### *A.* *Standard of Review*

This Court reviews preserved objections on hearsay grounds for an abuse of discretion. *United States v. Earth*, 984 F.3d 1289 (8th Cir. 2021). This Court will reverse "only when an improper evidentiary ruling has affected substantial rights or had more than a slight effect on the verdict." *United States v. Cannon*, 475 F.3d 1013, 1023 (8th Cir. 2007) (quotation omitted).

To the extent that Brown did not preserve an objection to any of the hearsay statements he now challenges on appeal, this Court reviews for plain error. *United States v. Waters*, 70 F.4th 467, 471 (8th Cir. 2023). To demonstrate plain error, Brown bears the burden to show "'(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, [this Court] may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (en banc) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). "'Appellate review under the plain-error doctrine, of course, is circumscribed and [this Court] exercise[s its] power under Rule 52(b) sparingly.'" *Id*. (quoting *Jones v. United States*, 527 U.S. 373, 389 (1999)).

## B.     *Discussion*

1.     *Harris's two statements to McVea about fearing someone was trying to kill him were properly admitted to show Harris's then state of mind.*

After being asked what behaviors he observed in Harris, Victor McVea testified that in the year-and-a-half before Harris died, Harris told McVea that he was worried about "people trying to kill him." (Tr., Vol. III, at 387.) Brown objected on hearsay grounds and requested a standing objection "to any statements Mr. Harris made out of court that's going to be repeated by

any witness so I don't keep interrupting counsel[.]"   (Tr., Vol. III, at 388.)

The district court granted that request.  (Tr., Vol. III, at 388.)

Government counsel then asked McVea what Harris had said about being afraid:

> A.    He was just going through a situation where he had a friend—I never met him, but I guess they had something going on in Arizona or something and a deal that went bad or something.  And he supposedly said his friend felt like he owed him, so—and we were dealing weed.  I guess the deal was with some low-grade weed from Arizona.  And I was bringing him high-grade weed.  And he was just getting into it with somebody, he was telling me.

> Q.    Had you noticed changes in his behavior?

> A.    Yeah.  He had moved, to like an area called, like Briarcliff.  And at first he was staying there like a regular—like—and they were like townhomes, where you could just walk up to the door.  But he had moved in where you need to, like, a scan card to get in the door, to get in the elevator, and stuff like that.  Because he was worried about his safety.

(Tr., Vol. III, at 389.)  Brown did not object to the later question about Harris's behavior or McVea's response that Harris's behavior changed because he was worried about his safety.  McVea also stated that he went with Harris to his apartment that needed a scan card to enter.  (Tr., Vol. III, at 389-390.)

Brown now claims that the court erred in admitting both McVea's original claim that Harris was worried about "people trying to kill him" and Harris's description of "getting into it with somebody."  (Brown Brf., at 19,

22-24.) The prohibition against admitting hearsay, however, does not exclude statements "of the declarant's then-existing state of mind." Fed. R. Evid. 803(3). Such statements, despite being hearsay, are admissible because the rule ensures trustworthiness through requiring "that statement be contemporaneous with the declarant's then existing state of mind, emotion, sensation, or physical condition." *United States v. Barraza*, 576 F.3d 798, 805 (8th Cir. 2009) (cleaned up).

Here, both statements conveyed Harris's then present mental condition—he feared that someone was trying to kill him and he was having some personal conflict with someone—and both statements are steeped in circumstantial guarantees of trustworthiness. *See Barrazza*, 576 F.3d at 804; Fed. R. Evid. 803 advisory committee's note. Not only did Harris tell McVea that he was afraid, but McVea also knew how the history between Harris and that person informed Harris's fear. (Tr., Vol. III, at 387, 389-390.) Both Harris's past dealings with Brown in general and the Arizona trip in particular, were corroborated by other, unobjected to evidence in the case. (Tr., Vol. III, at 407, 409-413.) Harris's self-reported state of fear was also corroborated by his actions. Without an objection, McVea testified to changes in Harris's behavior in the time before his murder, including moving to a different part of town and renting an apartment with secured access. (Tr., Vol. III, at 389-

390.) These circumstances further demonstrate the trustworthiness of Harris's claims that he feared Brown would kill him.

More importantly, nothing in the record suggests that Harris had a motive to lie about how he was feeling. These facts are unlike those in *United States v. Naiden*, where this Court affirmed the exclusion of the defendant's statement to a third-party that he believed an online acquaintance was more than 14 years old. 424 F.3d 718, 721-23 (8th Cir. 2005). In *Naiden*, the defendant reported his belief the day after the acquaintance said she was 14, which this Court found "was not made as an immediate reaction to his communication with her, but after he had ample opportunity to reflect on the situation." *Id*., at 722; *see also United States v. Partyka,* 561 F.2d 118, 125 (8th Cir.1977) ("The statements made by the husband were not self-serving declarations about a past attitude or state of mind, but were manifestations of his present state of mind, his immediate reaction to the proposal of Faircloth. As such, we think that they were admissible."). Unlike in *Naiden*, there are no facts here to suggest that Harris had any motive to mislead or conceal his true emotions. The circumstances here show that Harris reported being scared because he was scared, which is precisely the hearsay Rule 803(3) allows.

Brown argues that McVea failed to provide details sufficient to show that the statements "were made contemporaneous to when the statements were

first contemplated by Harris because of some event and when they were relayed to McVea." (Brown Brf., at 23.) Rule 803(3) does not require such a showing. Unlike Fed. R. Evid. 803(1) or 803(2), which both require that the hearsay be made after an "event or condition," Rule 803(3) does not require any event to prompt the statement. All that is required is a report of the declarant's then existing emotional condition, which Harris's reports of fearing Brown would kill him were.

Brown also argues that the trustworthiness of Harris's explanation for his fear of Brown "was undermined by later testimony at trial that this event in Arizona happened in 2013, before McVea knew Harris." (Brown Brf., at 23.) That observation, however, is irrelevant to whether Harris's then-present fears were reliably relayed. *See, e.g.*, *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 233 (2d Cir. 1999) ("[S]tatements falling under Rule 803(3)'s exception for presently-existing states of mind rarely suffer from the risks of faulty memory because they are made when the declarant is in the relevant state, and they bear minimal risk of faulty perception because speakers generally know their own states of mind."). Likewise, nothing from the record suggests, as Brown asserts in his brief, that Harris "was describing a state of mind that he had in 2013." (Brown Brf., at 24.) Rather, McVea stated that Harris related

his fear in the year-and-a-half before his murder, which was the time during which McVea knew him.

To the extent that McVea's recounting of what Harris told him about the trip to Arizona goes beyond Harris's present mental state, those statements were not hearsay, because they were not offered for the truth of the matters asserted. Rather, the statements were offered to provide the context and foundation for McVea's unobjected to lay opinion testimony that Harris was worried about his safety. *See* Fed. R. Evid. 701; *United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008) (holding that "lay opinion testimony regarding mental states is admissible under Rule 701"); *United States v. Ralston*, 973 F.3d 896, 913 (8th Cir. 2020) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth.").

That testimony was rooted in McVea's personal knowledge about Harris and the fact that he had a conflict with someone at the time as well as McVea's observations of Harris's change in behavior. *United States v. Turner*, 781 F.3d 374, 388 (8th Cir. 2015) ("Personal knowledge or perceptions based on experience [are] sufficient foundation for lay opinion testimony." (quotation omitted)). Lay opinion testimony requires a proper foundation for admissibility, and McVea's knowledge of Harris, his history,

and his current behavior provided that foundation for McVea's conclusion that Harris was scared.

      2.    *Harris's command to Tolefree to no longer deal with Brown was not hearsay.*

Tolefree testified that he recalled Harris and Cobbins traveling to Arizona with Brown, and that "when they got back, Ryan and Chris told us not to ever deal with him no more." (Tr., Vol. III, at 407.) At a sidebar, Brown objected on hearsay grounds, and requested "a standing objection to the hearsay comments that this particular witness will be making throughout his testimony." (Tr., Vol. III, at 408.) The district court took up another matter and did not rule on Brown's objection or acknowledge the request for a continuing objection. (Tr., Vol. III, at 408-409.) After the sidebar, Tolefree again testified that upon returning from Arizona, Harris told him, "Not to ever deal with [Brown] no more" regarding marijuana. (Tr., Vol. III, at 409-10.) Brown did not renew his objection at that time.

Whether or not preserved, the district court did not err in admitting Harris's commands to Tolefree to stop dealing with Brown. Commands are not offered for the truth of the matter asserted, because they are not assertive statements to begin with. *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay."); *see also United States*

*v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("Indeed, if the statements were questions or commands, they could not—absent some indication that the statements were actually code for something else—be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false.").

Rather commands are verbal acts unto themselves, and here Tolefree testified as to what he was told to do. *United States v. Tenerelli*, 614 F.3d 764, 771 (8th Cir. 2010) ("Verbal acts, however, are not hearsay because they are not assertions and not adduced to prove the truth of the matter." (quotation omitted)). There was no hearsay statement to exclude because there was no assertion, and therefore no matter for Tolefree to relate the truth of. The district court properly admitted this statement. *See also United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) ("[A]n order, *i.e.*, an imperative rather than a declarative statement, . . . [is] offered not for its truth, but for the fact that it was said. It [i]s therefore not hearsay.").

That the district court did not expressly rule on this objection does not mean the court erred. "This court is not bound by the grounds on which the district court admitted the evidence," and it may affirm on any ground supported by the record. *United States v. DeMarce*, 564 F.3d 989, 996 (8th Cir. 2009). Here, the record supports admitting the testimony as not hearsay.

*See also id.* (affirming admission of purported hearsay statement for non-hearsay purpose of explaining the origins of an investigation).

> 3. *Brown's statements to Tolefree relayed over social media were admissions of a party opponent.*

Tolefree testified that Brown "started contacting me through Snapchat demanding money and trying to be threatening." (Tr., Vol. III, at 414-15.) Tolefree recalled Brown sending him "messages of a tracking device and . . . messages demanding $10,000 a month." (Tr., Vol. III, at 415.) Tolefree said that Brown sent the messages to Harris and himself to inform Harris that "if he didn't pay $10,000, that he would end up" dead like Cobbins. (Tr., Vol. III, at 415-16.) Brown sent the messages through Snapchat, which is a messaging app that deletes the messages after they are read. (Tr., Vol. III, at 416.) Tolefree also testified that he and Harris had discussed the messages and both received the same messages from Brown. (Tr., Vol. III, at 416.) Harris showed Tolefree a screenshot of one of the messages Brown sent him. (Tr., Vol. III, at 443-444.)

Fed. R. Evid. 801(d)(2) provides that an opposing party's own statement offered against them "is not hearsay." Brown's Snapchat statements to Tolefree fall within the party-opponent rule, and the district court properly admitted them. *See, e.g.*, *United States v. Turner*, 934 F.3d

794, 798 (8th Cir. 2019) ("The text messages contain statements by an opposing party, which means they are not hearsay.").

Brown does not disagree. Rather, his argument on appeal is not that the statements were improperly admitted as statements of a party opponent, but rather that there was insufficient foundation for the court to have admitted them in the first place: "if these social medial statements actually existed, they could be admitted against Mr. Brown[] as his own statements and specific evidence of the course of conduct required for conviction of cyberstalking." (Brown Brf., at 24); *see also United States v. Ramirez-Martinez*, 6 F.4th 859, 866 (8th Cir. 2021) ("Although Appellant cloaks this challenge in the veil of Rule 801(d)(2)(A), his challenge is actually one of authenticity: he argues that the government did not sufficiently identify him as the 6140 number's user, which we construe as a challenge to the text messages' authenticity.").

Whatever Brown's precise claim on appeal may be, it was not preserved. Even if his continuing objection reached these statements, it certainly did not put the court on notice that Brown somehow believed the Government did not sufficiently authenticate the statements. Fed. R. Evid. 103(a). As such, this Court reviews Brown's claim on appeal for plain error. *See, e.g.*, *United States v. Boykins*, No. 23-1625, 2024 WL 208346, at *1 (8th

Cir. Jan. 19, 2024) (reviewing unpreserved objection to authentication of evidence for plain error).

The district court did not err, plainly or otherwise, in admitting Tolefree's testimony about Brown's Snapchats to him.  Fed. R. Evid. 901(a) provides that to authenticate "an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  *See also Ramirez-Martinez*, 6 F.4th at 866.  As such, "the party authenticating the exhibit need only prove a rational basis for that party's claim that the document is what it is asserted to be.  This may be done with circumstantial evidence."  *Id*. (cleaned up.)

Tolefree testified about Snapchat messages he received from Brown and further testified that Snapchat deletes messages after the recipient reads them.  Tolefree's testimony more than sufficed to provide a rational basis that he was testifying to statements made to him by Brown over Snapchat.  That is all that is required.

Brown appears to suggest that testimony from the Government's computer forensic examiner undermined Tolefree's testimony that the Snapchat statements were deleted.  (Brown Brf., at 24-25.)  The examiner, however, testified that she did not know "if in 2018 we could see Snapchat data," on a phone.  (Tr., Vol. III, at 564.)  Though the examiner also testified

that in 2018, Snapchat "sometimes" left some data on devices it claimed to delete, nothing in the record suggests that the application did not work as Tolefree understood it. (Tr., Vol. III, at 564-65.) The forensic examiner's testimony does not establish that the district court plainly erred in admitting Tolefree's testimony.

> 4.   *Tolefree's conversation with Harris about texts from Brown was offered for a non-hearsay purpose.*

Tolefree's testimony that he and Harris discussed receiving messages from Brown is not hearsay; rather it is Tolefree merely recounting that he told Harris certain things. *Cf. United States v. Wright*, 540 F.3d 833, 843 (8th Cir. 2008) ("[Witness's] testimony regarding whether conversations occurred is not hearsay."). But even if aspects of Tolefree's recounting of the fact that he discussed the topic with Harris did venture into hearsay, Brown's failure to make a specific objection at trial makes it difficult, if not impossible, for this Court to determine where Tolefree's personal knowledge ended and any hearsay testimony began.

This is particularly true because Tolefree testified that Harris showed him a screenshot of at least one of the communications Harris received from Brown. (Tr., Vol. III, at 444-44.) That screenshot alone provided a sufficient, non-hearsay basis for Tolefree's testimony, because Brown's statement relayed over Snapchat would have been a non-hearsay, party-opponent

statement.  *See, e.g.*, *United States v. Needham*, 852 F.3d 830, 836-37 (8th Cir. 2017) (affirming admission of screenshots as party-opponent statements).

> 5.     *Any error in admitting any of these statements would be harmless.*

To the extent the district court erred in admitting any of these statements, any error would be harmless.  "An erroneous evidentiary ruling does not [a]ffect a substantial right and is harmless error if, after reviewing the entire record, we determine that the error did not influence or had only a slight influence on the verdict."  *United States v. Marrowbone*, 211 F.3d 452, 455 (8th Cir. 2000).  Improperly admitting hearsay that is cumulative of other, admissible evidence constitutes harmless error.  *See United States v. Gilliam*, 934 F.3d 854, 860 (8th Cir. 2019).

Were this Court to subtract any, or even all, of the statements Brown challenges on appeal as hearsay, overwhelming evidence of Brown's guilt remains.  *See, e.g.*, *United States v. De La Cruz Nava*, 80 F.4th 883, 891 (8th Cir. 2023) (holding error harmless where remaining evidence was overwhelming).  As shown in the discussion of the sufficiency of the Governments evidence below, the Government proved each of the elements for Brown's cyberstalking and conspiracy convictions by multiple pieces of evidence.  Removing any of these statements from the Government's proof would not influence the weight of the evidence to convict in any way.  *See,*

*e.g.*, *United States v. Stoney End of Horn*, 829 F.3d 681 (8th Cir. 2016) (holding error harmless where "record as a whole, excluding the hearsay, shows a convincing case" of defendant's guilt). Even were it to find an error regarding the admission of hearsay, this Court should affirm.

## II.

**The district court did not err in admitting testimony regarding Brown's previous drug dealing and murder of Ryan Cobbins because both topics were direct evidence of the victim's reasonable fear of bodily injury from Brown.**

Prior to trial, and out of an abundance of caution, the Government provided notice under Fed. R. Evid. 404(b) of its intent to present evidence about Harris's prior dealings with Brown and Harris's belief that Brown was involved in the death of Ryan Cobbins. (R. Doc. 120.) Over Brown's objection, the district court found that evidence admissible as intrinsic evidence that directly proves the crimes charged. (R. Doc.123; R. Doc. 154, at 7-9.) The court also found that the evidence was highly probative and not unfairly prejudicial. (R. Doc. 154, at 9-10.)

The district court did not err. To prove Brown committed cyberstalking, the Government was required to prove either that Brown's conduct gave Harris a reasonable fear of death or serious bodily injury or would be reasonably expected to cause Harris substantial emotional distress. *See* 18 U.S.C. 2261A. The history between Harris and Brown—including Harris's decision to stop doing marijuana business with Brown and Brown subsequently extorting money from Harris for Cobbins's return, only for Harris to learn soon after that Cobbins had died—directly proves why Brown's later threats to Harris caused him to fear for his life. The jury could

not have understood the significance of Brown stating that Harris would end up like Cobbins unless it knew what happened to Cobbins. Brown's threats were steeped in his prior dealings with Harris, and those prior dealings provided direct evidence of Harris's reasonable fear of his impending murder.

## A. *Standard of Review*

This Court reviews the admission of other act evidence "for an abuse of discretion and will reverse only when the evidence clearly had no bearing on the case and was introduced solely to show defendant's propensity to engage in criminal misconduct." *United States v. Grady*, 88 F.4th 1246, 1257 (8th Cir. 2023) (cleaned up). A district court does not abuse its discretion by admitting such evidence unless it had no bearing on any material issue in the case. *United States v. DeAngelo*, 13 F.3d 1228, 1232 (8th Cir. 1994).

## B. *Discussion*

1. *Evidence about Harris's prior dealings with Brown and Harris's belief that Brown killed Cobbins directly proved an element of cyberstalking.*

Rule 404(b) allows for the admission of "[e]vidence of a crime, wrong, or other act" only when it is used for a non-propensity purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1) and (2). That rule, however, "applies only to 'other crimes, wrongs, or acts,' . . . it

'does not extend to evidence of acts which are 'intrinsic' to the charged offense.'" *United States v. Maxwell*, 643 F.3d 1096, 1100 (8th Cir. 2011) (quoting Advisory Committee's Note on Fed. R. Evid. 404(b)).

"[I]ntrinsic evidence[ ] is evidence of wrongful conduct other than the conduct at issue offered for the purpose of providing the context in which the charged crime occurred." *United States v. Campbell*, 764 F.3d 880, 888 (8th Cir. 2014) (cleaned up). It "includes both evidence that is inextricably intertwined with the crime charged as well as evidence that merely 'completes the story' or provides context to the charged crime." *United States v. Young*, 753 F.3d 757, 770 (8th Cir. 2014).

To find Brown guilty of cyberstalking, the Government must prove that he engaged in a course of conduct that placed Harris "in reasonable fear of . . . death or serious bodily injury" or "would be reasonably expected to cause substantial emotional distress" to Harris. 18 U.S.C. § 2261A(2); *see also United States v. Gonzalez*, 905 F.3d 165, 180 (3d Cir. 2018) (discussing elements of cyberstalking); *United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022) (same). Direct proof of the basis for Harris's fear of harm from Brown, consequently, is direct evidence of an element of the offense and intrinsic to the Government's proof of that count. *See, e.g.*, *United States v.*

*Curley*, 639 F.3d 50 (2d Cir. 2011) (holding that prior abuse of victim by defendant was inextricably intertwined with proof of victim's fear).

Here, the district court properly admitted evidence about Harris's prior dealings with Brown—notably their prior drug dealing relationship and Ryan Cobbins's subsequent murder—as intrinsic evidence to prove the reasonableness of Harris's fears that Brown was trying to hurt or kill him. *See, e.g.*, *United States v. Guzman*, 926 F.3d 991, 1000 (8th Cir. 2000) (holding references to defendant's involvement with marijuana and guns was inextricably intertwined with methamphetamine conspiracy); *United States v. Lee*, 790 F.3d 12, 16-17 (1st Cir. 2015) (affirming district court admission of evidence of prior abuse of victim as evidence of whether her fear was reasonable).

The challenged evidence showed that back in 2013, Brown, Harris, and Cobbins were involved in selling marijuana together. (Tr., Vol. III, at 406-10.) At some point in 2013, Cobbins went missing following an appointment at a barber shop. (Tr., Vol. III, at 410.) Brown reached out to Harris, purportedly on behalf of his cousins who were holding Cobbins, to request $20,000 to $30,000 for his return. (Tr., Vol. III, at 411.) Harris paid, but later Cobbins was found dead. (Tr., Vol. III, at 411-12.) No one was ever charged for Cobbins's murder. (Tr., Vol. III, at 436.)

In February 2018, Brown contacted Harris, and afterward Harris's behavior began to change. (Tr., Vol. III, at 414-21.) After the personal encounter, Brown began sending messages by social media to Harris and Tolefree demanding they pay him $10,000 a month or Harris would end up like Cobbins. (Tr., Vol. III, at 415-16.) Brown also sent photos of a GPS device. (Tr., Vol. III, at 416.) Harris understood this to be a threat and searched the cars of family members for GPS devices. (Tr., Vol. III, at 417-18.) Harris also changed where he lived, his travel habits, and what vehicles he used out of fear from Brown. (Tr., Vol. I, at 62; Tr., Vol. III, at 387, 389-90, 421-22.)

This evidence directly proved Harris's reasonable fear of death or serious bodily injury from Brown as well as showed that Brown's behaviors, including tracking Harris, would be reasonably expected to cause Harris substantial emotional distress. *See United States v. Walker*, 665 F.3d 212, 228-29 (1st Cir. 2011) (holding in interstate stalking case that evidence of prior threats was admissible as proof of reasonableness of fear of harm); *see also United States v. LeCompie*, 108 F.3d 948 (8th Cir. 1997) (holding in aggravated assault prosecution that evidence of victim's fear about a knife was intrinsic to proof of whether assault occurred); *United States v. Torres*, No. 21-2662, 2023 WL 378942 at *2, *4 (2d Cir. Jan. 24, 2023) (unpublished)

(holding in kidnapping case that victim's knowledge of prior assault of third party was directly relevant to whether victim believed she could leave).

Brown appears to misapprehend what evidence the Government presented and what the Government presented it to prove. Brown claims that "the events from five years prior did not prove that Mr. Brown engaged in a current course of conduct to place Harris in reasonable fear." (Brown Brf., at 30.) The Government, however, did not present the evidence of Brown's past dealings with Harris to prove Brown's current course of conduct. Rather, the Government presented Harris's understanding of those dealings to prove that Harris then possessed a reasonable fear of harm from Brown. Brown's argument largely fails to acknowledge this point. (*See* Brown Brf., at 30-32.)

Brown's reliance on *United States v. White Plume*, 847 F.3d 624 (8th Cir. 2017), is similarly misplaced. In *White Plume*, this Court affirmed the exclusion of evidence of prior child abuse that involved "different victims, different injuries, and different degrees of severity." *Id*. at 629. The *White Plume* court, however, considered whether the prior child abuse was being offered as mere propensity evidence to prove who committed the present crime. *Id*. at 628-629. In this case, the propensity issue was not present. The Government did not present Brown's prior dealings with Harris to prove Brown stalked and killed Harris. Rather, the Government presented that

evidence to prove that Harris feared for his life. *White Plume* offers no insight on the admissibility of that evidence.

Brown also argues that the evidence should have been excluded under Fed. R. Evid. 403 because its probative value was substantially outweighed by its danger of unfair prejudice. (Brown Brf., at 35); *see also Guzman*, 926 F.3d at 1000 (noting that "when admitting intrinsic evidence, the dictates of Rule 403 must still be applied" (cleaned up)). Brown does not, however, identify any unfair prejudice that resulted from the introduction of the evidence. *See United States v. Gant*, 721 F.3d 505, 510 (8th Cir. 2013) ("Damaging evidence is always prejudicial; the question is whether the evidence is unfairly prejudicial.") Brown's only argument, it appears, is that the evidence was of such "marginal or questionable utility" that its admission would likely result in a mini-trial. (Brown Brf., at 35.)

As shown above, however, the evidence was highly probative of an essential element of the crime—Harris's reasonable fear of death from Brown—and the prejudice to Brown's case was entirely fair. *See, e.g.*, *United States v. Skarda*, 845 F.3d 370, 377-78 (8th Cir. 2016) (holding that evidence of threats to witnesses was not unfairly prejudicial because it showed consciousness of guilt); *Walker*, 665 F.3d at 229 (holding that evidence of prior threats was "more probative than prejudicial"). There is no risk of a

mini-trial when the evidence directly proves what the jury must find to convict.

Lastly, to the extent any of the challenged evidence were not intrinsic, it would nonetheless be admissible under Fed. R. Evid. 404(b). That rule permits the admission of other acts to demonstrate a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Monds*, 945 F.3d 1049, 1052 (8th Cir. 2019) (quotation omitted). Evidence admitted under Rule 404(b) must "be (1) relevant to a material issue raised at trial, (2) similar in kind and close in time to the crime charged, (3) supported by sufficient evidence to support a jury finding the defendant committed the other act, and (4) of probative value not substantially outweighed by its prejudicial effect." *United States v. Brown*, 88 F.4th 750, 575 (8th Cir. 2023). "Rule 404(b) is a rule of inclusion," meaning the evidence is presumed admissible. *United States v. Crow Ghost*, 79 F.4th 927, 935 (8th Cir. 2023).

To prove the crime of cyberstalking, the Government had to prove Brown acted "with the intent to kill, injure, harass, intimidate, or place under surveillance." 18 U.S.C. § 2261A. Brown's history with Harris, and especially Brown's history of using the threat of violence to get money from Harris, is deeply probative as to Brown's motive, knowledge, intent, and lack

of mistake in committing the present crimes. *See, e.g.*, *United States v. Walker*, 428 F.3d 1165, 1169-71 (8th Cir. 2005) (affirming admission of ten-year-old conviction for making threats as evidence of motive and intent in possession of an unregistered firearm case). Brown's prior dealings with Harris were likewise close in time, especially given Brown's own reference to them, and extremely similar in kind to what Brown was charged with in this case. And as shown above, the evidence was highly probative and in no way unfairly prejudicial. *See also United States v. Jongewaard*, 567 F.3d 336, 341-42 (8th Cir. 2009) (affirming admission of three-year-prior threat to prove intent or absence of mistake in prosecution of a later threat).

Consequently, even if the district court had erred in admitting the evidence as intrinsic to the charged crimes, the evidence was admissible under Fed. R. Evid. 404(b), and this Court should affirm.

## III.

**There is sufficient evidence to affirm both Brown's conspiracy conviction and his conviction for cyberstalking resulting in death.**

On appeal, Brown challenges the sufficiency of the evidence for only two of his three convictions—his conviction in Count One for conspiracy to commit cyberstalking, in violation of 18 U.S.C. § 371; and his conviction in Count Two for cyberstalking resulting in death, in violation of 18 U.S.C. §§ 2261A(2), 2261(b)(1), and 2. The Government presented more than sufficient evidence at trial to support both convictions, and this Court should affirm.

### A.    *Standard of Review*

This Court reviews the sufficiency of the evidence "in the light most favorable to the government, giving the government the benefit of all reasonable inferences." *United States v. Lussier*, 844 F.3d 1019, 1021 (8th Cir. 2017) (quotation omitted). This Court must view the evidence in the light most favorable to the verdict and may only overturn the jury's verdict of guilty if it determines that a reasonable-minded jury must have a reasonable doubt as to the guilt of a defendant. *United States v. Ihmoud*, 454 F.3d 887, 890 (8th Cir. 2006); *see also United States v. Cacioppo*, 460 F.3d 1012, 1021 (8th Cir. 2006) ("A motion for judgment of acquittal should be granted only if there is

no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." (quotation omitted)).

This Court has "very limited latitude" and must not "weigh the evidence or assess the credibility of witnesses" when ruling on a motion for judgment of acquittal. *United States v. Thompson*, 285 F.3d 731, 733 (8th Cir. 2002) (quotations omitted). "[I]f there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt," this Court "must uphold the verdict." *United States v. Wainright*, 351 F.3d 816, 822 (8th Cir. 2003). This is a very strict standard of review, "and the jury's verdict is not to be lightly overturned." *Id*.

## B.   *Discussion*

> *1.   The Government presented sufficient evidence to prove Brown committed cyberstalking resulting in Harris's death.*

To find Brown guilty of cyberstalking resulting in death, the Government needed to prove that (1) acting "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person," (2) Brown used "any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce," (3) "to engage in a course of conduct that" placed Harris "in reasonable fear of . . . death . . . or serious bodily injury" or

caused, attempted to cause, "or would be reasonably expected to cause" Harris "substantial emotional distress," and (4) Harris died as a result. 18 U.S.C. §§ 2261A(2), 2261(b)(1); *see also Sryniawski*, 48 F.4th at 587.

*First*, Brown unquestionably acted with an intent to kill, injure, harass, intimidate, or place Harris under surveillance with the intent to do the same. Brown threatened Harris, knowing full well what it meant to Harris to tell him he would end up like Cobbins. (Tr., Vol. I, at 60-62, Tr., Vol. III, at 414-21.) Brown knew Harris did not view his threats as idle, and fully intended Harris to have a very real fear for his life. *See United States v. Fleury*, 40 F.4th 1353, 1367 (11th Cir. 2021) (affirming cyberstalking conviction where "there was sufficient evidence of Fleury's subjective intent to threaten"). Brown in fact killed Harris, and the jury could easily infer that Brown intended to do what he actually did.

Even accepting Brown's account that his ultimate intent was to extort or rob Harris, such conduct likewise satisfies the intent element, because extortion and robbery involve harassment and intimidation. *See United States v. Hobgood*, 868 F.3d 744, 747-48 (8th Cir. 2017) (holding that defendant's extortionate communications violated cyberstalking statute); *Stokeling v. United States*, 586 U.S. 73, 77 (2019) (noting that at common law, robbery "has long required force or violence").

That some of the evidence indicated that Brown sought to kidnap Harris on the night of the murder does not undermine that he acted with requisite intent. (Tr., Vol. III, at 313-15, 363-64.) As the makeshift handcuffs found in Brown's car showed, had Brown intended to kidnap, it would have been by force and against Harris's will. That likewise suffices to prove Brown acted with the intent to at least harass Harris and place him under surveillance to do the same.

*Second*, Brown stipulated that the companies behind both the SpyTec trackers and the SPOT trackers "provided interactive computer services, electronic communication services, and electronic communication systems of interstate commerce by providing global positioning system, GPS, [and] satellite tracking services on small electronic devices." (Tr., Vol. III, at 591-92.) That it is, the parties agreed that the trackers used in this case fall under the cyberstalking statute. *See* 18 U.S.C. § 2261A(2).

The evidence further proved that Brown used both SpyTec and SPOT trackers. Records show Brown's purchase of four trackers, two of each type. (Tr., Vol. III, at 306; Tr., Vol. IV, at 679-680.) He used the same bank account to pay for services from both companies, and eBay records show his purchase of the SpyTec trackers. (Tr. Vol. II, at 305-07; Tr., Vol. III, at 586; Tr. Vol. IV, at 657-58.) GPS logs show that the SpyTec device was activated at

Brown's residence at the same time he opened an account for that service. (Tr., Vol. III, at 586-88; Tr., Vol. IV, at 604-05, 610-11, 626-30, 679, 756-57.) Records show that Brown had the SPOT app on his phone and that he logged into his SpyTec account at two residences he frequented and using the same cellular carrier that provided his phone service. (Tr., Vol. III, at 604-07; Tr., Vol. IV, at 638, 647-49; 756-57, 762-63.)

*Third*, not only did Brown use the trackers, he used them as a part of a course of conduct that placed Harris in a reasonable fear of death or serious bodily injury or would be expected to cause substantial emotional distress. For the cyberstalking statute, "[t]he term 'course of conduct' means a pattern of conducted composed of 2 or more acts, evidencing continuity of purpose." 18 U.S.C. § 2266. Not all of the conduct need be through the use of interstate communication devices. *See., e.g., United States v. Roberts*, 84 F.4th 659, 672 (6th Cir. 2023) (noting course of conduct for cyberstalking conviction "involved his convincing Mr. Caldwell to travel to a remote place by texting him as 'Debbie Brown'" and "it also involved the dispute that followed in which Roberts threatened Mr. Caldwell while visibly carrying a firearm").

Brown's use of two different trackers on Harris's car alone suffices to establish the required course of conduct, but he did much, much more. To begin, Brown tracked Harris for months. He placed the SPOT tracker on

Harris's car in January 2018, and it lasted until the latter part of February, including the time when Brown encountered Harris at a mall. (Tr., Vol. II, at 60-62; Tr., Vol. III, at 418; Tr., Vol. IV, at 679-80, 695-704.) Then in March, Brown attached the SpyTec tracker, and followed Harris's movements for two days, including near constant tracking in the hours before Harris's death. (Tr., Vol. IV, at 604-05, 610-11, 626-38.) Beyond the tracking, Brown harassed Harris in person, by posting a video on social media, and through threatening messages on Snapchat. (Tr., Vol. II, at 60-62; Tr., Vol. III, at 414-21, 443-44.) In the end, Brown used the GPS tracker to find Harris, blocked Harris's car in the driveway, and shot Harris as he tried to save his daughter and himself. (Tr., Vol. II, at 271-273; Tr., Vol. III, at 313-15, 470-71, 506-10.) The evidence left no doubt that Brown engaged in the required course of conduct.

There was similarly no doubt that the course of conduct resulted in Harris becoming afraid. Harris feared for his life. He said as much, and his actions showed that his fear was sincere. (Tr., Vol. II, at 62; Tr., Vol. III, at 387, 389-90; 414-421.) He moved to what he believed to be a safer apartment and considered leaving town. (Tr., Vol. II, at 62; Tr., Vol. III, at 387, 389-90.) He searched the cars of his loved ones for tracking devices. (Tr., Vol.

II, at 176-78; Tr., Vol. III, at 417-18, 23.) He was desperate to keep himself and his daughter safe.

Moreover, Brown's course of conduct culminated in a moment that undeniably placed Harris in a reasonable fear of death—the moment Harris pleaded with Brown not to shoot him in front of his eight-year-old daughter, only for Brown to kill Harris anyway. (Tr., Vol. I, at 56-57, 68-69.) Two witnesses specifically testified that Harris was scared in that moment. (Tr., Vol. I, at 57, 68.) He shouted, "I've got my daughter with me, I've got my daughter with me," so loudly, he could be heard from inside a neighbor's house across the street. (Tr., Vol. I, at 56-57; 66, 68.) He feared for his and his daughter's lives. The cyberstalking statute does not dictate when the course of conduct must cause fear or emotional distress, and in this case, there is no doubt that Harris spent the fleeting moments before his murder in terror.

*Fourth*, Brown found Harris on March 14, 2018, through tracking him via the SpyTec GPS device, which was integral to his course of conduct. (Tr., Vol. III, at 509-10, 525; Tr., Vol. IV, at 650.) When Brown found Harris, he killed Harris by shooting him twice in the head. (Tr., Vol. II, at 117, 137, 156-167.) The evidence leaves no doubt that Harris's death resulted from Brown's cyberstalking activities. *Cf. United States v. Gonzalez*, 905 F.3d at 182 (affirming cyberstalking conviction where defendant's "involvement in the

stalking campaign, as well as his actions in setting up the court hearing and bringing [shooter] to the courthouse where he then shot [victim], are sufficient to support an interference that he was the "but for" cause of [victim's] death").

Given the overwhelming evidence of guilt, this Court should affirm Brown's conviction for cyberstalking resulting in death.

2.    *Brown's arguments to the contrary are unavailing.*

Facing that overwhelming evidence of his guilt, Brown provides two grounds for his claim the evidence was insufficient. Both fail.

   i. The jury was not required to find that Brown aided and abetted Young or Pearson to convict.

Brown first asserts that to convict Brown of cyberstalking resulting in death, the Government had to prove that Brown aided or abetted Young or Pearson in that crime. (Brown Brf., at 38.) According to Brown, because the Government proved that he, rather than Young or Pearson, was the "principal actor," the evidence was not sufficient to convict. (Brown Brf., at 39.)

Brown cites no case to support this claim. His only citation is to the verdict director instruction for that count, but that instruction includes both principal and aiding and abetting liability. (R. Doc. 239, at 36-37.) Presumably, Brown bases his claim on his indictment describing the count, in a caption, as "aiding and abetting cyberstalking resulting in death" and citing the federal aiding and abetting statute, 18 U.S.C. § 2. (R. Doc. 1, at 1, 12.)

The indictment, however, alleges that Brown, Pearson, and Young, "aiding and abetting each other, . . . used any interactive computer service . . . ." (R. Doc. 1, at 12.) The indictment specifically charges all three defendants as principals and aiders and abettors and does not somehow rule out principal liability for any of the three.

In fact, aiding and abetting liability is just another way to prove principal liability. *See* 18 U.S.C. § 2(a) ("Whoever commits and offense against the United States or aides, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); *United States v. Thirion*, 813 F.2d 146, 151 (8th Cir. 1987) (noting federal aiding and abetting statute "does not create a separate offense, it simply makes those who aid and abet in a crime punishable as principals" (quotation omitted)); *United States v. Edwards*, 782 F.3d 554, 563 (10th Cir. 2015) (explaining that "the fact that an indictment charges two defendants with aiding and abetting one another to commit a crime does not limit the government to a conviction based solely on a theory of aiding and abetting"). Here, the jury was instructed on both theories of liability and Brown does not contest that instruction on appeal. The jury could have convicted on either theory, and given the Government's evidence was sufficient to prove Brown was the principal actor, that evidence was sufficient to convict.

ii. Brown's course of conduct placed Harris in fear and resulted in his death.

Brown next claims that Brown's use of a GPS device to track Harris "cannot be the entirety of his course of conduct because that conduct alone cannot cause emotion[al] distress to the victim if he does not know that he is being tracked." (Brown Brf., at 42.) Brown, however, misapprehends what the statute requires. The statute requires that interactive communications devices be used as part of the course of conduct, not that such devices must be used for all parts of that course of conduct. Whatever Brown said to Harris at the mall put Harris in fear and was part of his course of conduct in this case. That alone was sufficient to convict.

But contrary to Brown's recounting of the evidence, the Government did prove that Brown used Snapchat, another electronic communication system of interstate commerce, to threaten Harris. In addition, the Government further proved that Harris feared Brown placed GPS trackers on his car, which was another way in which Brown's course of conduct caused Harris to fear for his life. Lastly, and as stated above, Brown's use of a GPS device to track Harris on the night of his death was unquestionably part of the course of conduct that caused Harris the very real and tragic fear that Brown would kill him. Brown committed his cyberstalking crime in a manner that unquestionably resulted in Harris's death.

*3.*    *The Government also presented sufficient evidence that Brown conspired to stalk Harris.*

To convict Brown of conspiracy, in violation of 18 U.S.C. § 371, "the Government had to show that (1) two parties entered into an agreement or reached an understanding to commit a crime, and (2) at least one of the parties overtly acted in furtherance of the agreement." *United States v. Anderson*, 783 F.3d 727, 749 (8th Cir. 2015) (quotation omitted). Here, the evidence established both that Brown entered into an agreement with Young and Pearson to commit a crime and that Brown and Young committed overt acts in furtherance of that conspiracy.

Young agreed, at least as early as January 18, 2018, to assist Brown in stalking Harris. Young testified that Brown typed a license plate into Young's phone, which Young kept. (Tr., Vol. III, 497-498, 540-44; Tr., Vol. IV, at 695-96.) The plate belonged to Harris's girlfriend. (Tr., Vol. II, at 174.) Records along with an analysis of Young's phone show that the note was made on the same day Brown took one of the trackers to her hair salon, after which that tracker was on Harris's car. (Tr., Vol. IV at 698-704.) Young also admitted that at Brown's request he searched for Tolefree's address on his phone and drove by that address looking for Tolefree's car, which analysis of his phone confirmed. (Tr., Vol. III, at 499, 540-44.) Young likewise drove

with Brown past an apartment in Briarcliff, which is where Harris lived. (Tr., Vol. III, at 500-01.)

On the night of Harris's murder, Young and Pearson both went with Brown knowing that he intended to do some sort of illegal activity, whether a robbery or something else. (Tr., Vol. II, at 266-68, 270, 294; Tr., Vol. III, at 504-06.) Likewise, Pearson testified that both Young and Brown were using their phones to track someone with a GPS device. (Tr., Vol. II, at 271.) Young testified that Brown used Young's phone. (Tr., Vol. III, at 509-10.) Either way, Young acted in concert with Brown to track Harris. And Young continued to act in concert with Brown when he hopped out the car at the same time Brown did at the moment of the murder. (Tr., Vol. II, at 273; Tr. Vol. III, at 506-07.)

These facts more that sufficiently show that both Brown had an agreement with at least one other person to commit cyberstalking and that, in addition to all of Brown's conduct, at least Young committed an overt act in furtherance of that conspiracy. The evidence was sufficient to convict Brown on the conspiracy account as well. *See Gonzalez*, 905 F.3d at 180-81 (holding evidence sufficient to convict on conspiracy to commit cyberstalking).

Brown argues that there was no conspiracy because the three co-conspirators lacked a "common goal." (Brown Brf., at 38.) Brown's focus,

however, is much narrower than what the charge required. In particular, the Government did not need to prove that Young or Pearson "knew of Mr. Brown's plan to track Harris using GPS and shoot him." (Brown Bfr., at 37.)

For starters, the conspiracy was to commit cyberstalking, not cyberstalking resulting in death. (R. Doc. 1, at 5; R. Doc. 239, at 30.) In addition, the Government needed to prove that there was an agreement to commit that crime but did not need to prove that each co-conspirator knew every detail of the plan. *Blumenthal v. United States*, 332 U.S. 539, 557 (1947); *United States v. Clay*, 618 F.3d 946, 951 (8th Cir. 2010) ("Clay may not have known every detail of the conspiracy. But the law does not require such knowledge."). Here, the evidence proved that Young and Pearson both knew that Brown was using a GPS device to track Harris and commit some type of violent crime—whether robbery, extortion, kidnapping, or something else—against him that would be expected to cause Harris emotional distress. That evidence was sufficient to prove conspiracy to commit cyberstalking.

# CONCLUSION

For the reasons stated above, this Court should affirm Brown's convictions.

Respectfully submitted,

TERESA A. MOORE
  United States Attorney

By    */s/ Brian P. Casey*

BRIAN P. CASEY
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Appellee*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,308 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 software in 14-point, Times New Roman font. Furthermore, the document has been determined to be virus-free in compliance with Eighth Circuit Rule 28A(h).

*/s/ Brian P. Casey*　　　　　　

Brian P. Casey
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2023, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. A paper copy will be served on participants in the case by U.S. Mail, postage prepaid, within five days of the Court's notice that the brief has been reviewed and filed.

I hereby certify that a copy of the Government's brief was mailed on _____, 2023, to:

> Quinn A. Michaelis
> 73 West Monroe, Suite 106
> Chicago, Illinois  60603
>
> *Attorney for Appellant*

> */s/ Brian P. Casey*
> Brian P. Casey
> Assistant United States Attorney